Case 12-1072, et al. DHL Express, Inc. Petitioner v. National Labor Relations Board Mr. Cadella for the petitioner, Ms. Sheely for the respondent. Good morning. May it please the Court, David Cadella on behalf of DHL Express. We're here before you because of a footnote in a two-member board decision. A footnote that resulted in what amounts to an unprecedented decision, holding that DHL impermissibly banned the distribution of literature in a hallway of its facility because the facility is not exclusively a work area. You make much of their use of that phrase, not exclusively a work area. Is that a fair reading of what they're saying? Aren't they really talking about a mixed-use area? I mean, after they use the phrase exclusively a work area, they cite a case, quote a case that makes clear they're talking about a mixed-use area. And that indeed is the problem. They've extrapolated a case that doesn't stand for that proposition and now have issued a decision that refers to an area having to be an exclusive, whether an area is exclusively a work area. So if this is a mixed-use area, we have no appeal by you, no challenge? I'm sorry? If this is a mixed-use area? If it's a mixed-use area, then we have to ask what is the appropriate standard. Our position is that the Board has never articulated an appropriate standard for a mixed-use area, that it's done so in these kind of cases on an ad hoc basis. What about United Parcel Service? Didn't they give a reasoned basis there? I don't believe they did. I believe if you look at that case, in fact, if you look at UPS, you look at Transcom, you look at Arkansas Best Freight, you look at all of those cases, what you're finding is that the mixed-use term is used in a context where you've got contamination of an area with other types of distribution or the employer didn't have an effective no distribution policy in place. So what the Board was saying was that this is a mixed-use area. And you go, well, what's that mean? If it's a mixed-use area, it means necessarily that there are employees on working time. Can we ban distribution on working time? Absolutely. So we've got two issues, a working area and a working time issue. Mixed-use implicates both, and we're saying how do we get around that as a Board? We say that you cannot ban distribution if you haven't equally enforced your no distribution rule. If you're discriminatorily implying it, then it's inappropriate. Well, the Board didn't get there, right? The Board said, as I understand its factual findings, was that, in fact, the activities going on in this hallway involve non-work and employees. There's no question. And our position of the case was we're not saying it's 100% a work area. We didn't dispute that there's non-work-related use of the hallway. That's what I thought, yeah. But we also said there's plenty of work-related use of the hallway. Well, there was that office off the hallway where packages were taken, but that's consistent with mixed-use, isn't it? I mean, all this other stuff was going on in the hallway that the employer allowed. There's no statement by the employer that these other things were impermissible. I think that the key fact is, in it being a mixed-use area, is that you've got employees working various shifts who are using that hallway for various purposes. They are on duty. They are working. There's no question that it's their working time. And in some respects, they're doing productive work, whether they're carrying packages from the QC, SRC area, as we refer to it, or you've got employees coming from the ramp, using the hallway to go to the truckload area to perform work there, or vice versa, going back. But you've got people that you can't distinguish whether they're reporting for work, and you've got 900 people reporting for work, and you may have a couple hundred people who are already at work in that hallway. What should we make of Mr. Swallow's comment that the company would have agreed to the distribution if the union had agreed to the same terms as the Teamsters? What are we to make of that? Yeah, I think that's an interesting issue that goes to the question, if the burden did shift to the employer to establish special circumstances, how do you distinguish allowing the Teamsters on site to not permitting the employee leafleters for the APWU? And I think it goes to that particular issue, which we submit should not have been reached. But if you do reach it, then it goes to time, place, manner type restrictions. As an employer, and we're relying on third parties, do we have the right, and that's what the rule says, to set the time during which we can give permission to third parties to come on? A rule allows that. And in the case of the Teamsters, in the case of the job fairs, in the case of all those things, we did it after the sort ended, so it would be after 4 a.m. in the morning, and we did it with personnel present because they had to be present for those things. And so that would have been the case with the APWU if they wanted to bring their own organizers on. So remind me, how did the Teamsters distribute their materials? So the Teamsters had a charge check neutrality agreement with DHL, under which they were permitted to provide advance notice that they wished to come on and organize the employees in return for all the commitments they made under the agreement. And DHL then gave a notice to the employees the day before they were coming on. They came on about three times. They gave a notice that these guys are going to come on. They set up a table, and they had their authorization cards. They had literature and whatnot off to the side. Off to the side. But would they distribute them to employees as they walked by? The testimony was that they were calling out to people, hey, we've got, you know, come look at this stuff. But they were off to the side in tables. And then how was that different from the union in this case? Well, again, that was done with the permit. Right, right. But I'm talking about the manner of distribution. But in terms of the manner of distribution, the employees were scattered throughout the hallway. Some were on the side of the window. Some were by the milestone side. So if you look down this hallway, you've got a large gallery out there, and on the other side you've got milestones. So three of them would be scattered about in the hallway. Well, to the extent that the board has a standard, I know you don't think they do, but to the extent that they have a standard relating to mixed-use areas, they permit an exemption or an exception for special circumstances. Yes. And so you mentioned special circumstances, but why didn't the company articulate what the special circumstances were with respect to this area? I think we did put on evidence of that. I know we put on evidence about the safety and security risks that would be associated with upwards of 900 employees coming through a narrow hallway over a two-hour period where they have to pass through security scanners where you've got various federal regulations in place. That doesn't seem different from the other kinds of activities that were going on. In other words, if this is an area where there's a lot of social interaction, there's a lot of milling around and so forth, in other words, there doesn't seem to be anything that you could point to that's a disruption of discipline or productivity with this distribution than the other things that were happening. That's what I'm asking. I understand, and I appreciate that, and I think that the difference is that where employees would potentially congregate would be at the kiosk where they had the computers that were off to the side before they go through the doorways into the breezeway. That would be different. The other testimony was that there wasn't a whole lot of milling around. If you look at James Hamilton's testimony and look at it closely, he's the only one who really testified about this. He said, well, people would come in and they would talk while they were walking through or they might occasionally be waiting for someone, but they were generally moving along, that any conversations were people were moving along. Because necessarily, when you've got all those people going through, if you stand in the way, you could get trampled down. And the pictures that we put in show that there's a horde of people coming through there. I think it's relevant to look at the Lytton decision that's cited in the board brief because that's similar except the guards there were employees of the company and we had contractor guards, and they said, this hallway where employees were checking in is a work area for those guards, and therefore it was permissible to ban distribution in the hallway. So draw that distinction and say, all right, well, just the guards working there. We've got all these other people who are engaged in work there. So it's really difficult to reconcile these decisions. But I think the biggest issue here is that this decision, and there's a subsequent decision, Mercedes Benz, that is now on appeal at the 11th Circuit, where the board also used this exclusive work area term, and the company there has appealed the case, making many of the same arguments we do, and one of which is here. The board's order says you're not permitted to disallow hand billing in this hallway at any time. They didn't narrow it down to say when employees are coming or leaving work. It's at any time. So they've extrapolated a mixed-use test and made it synonymous with this whole area is a non-work area 100% of the time. And employers can't work with that. And that would tend to transform, you know, almost virtually every work area, because who can't say there's non-work being done in a particular area into a non-work area and effectively shift the burden to employers in every case to establish these so-called special circumstances, issues relating to production or discipline. Yes, I thought that was the position your client took. I thought that was the position that your client took, that the employer was not required to show special circumstances. Exactly. Our position was that it's a work area, and if it's a mixed-use area, that there's enough work being performed there to treat it as a work area, that the presumption should not shift that it's a non-work area and impose the burden on us when, you know, and the board says in its opinion there was no evidence that leaflets were distributed to employees who were on duty. And I would submit there was no evidence that there was leaflets distributed to employees who were off duty. There was no evidence at all on that. But we know there were employees who were on duty in that hallway. All right. Thank you. Thank you. Good morning, Your Honors. Barbara Sheehy for the National Labor Relations Board. I want to talk about two main things. The first one being I'd like to address the point that the board decision rests uniquely on cases that don't apply in the mixed-use sense and on the basis of a single footnote. And I wanted to clarify that. So the board cites to, we're all talking about footnote number one, in adopting, and this is a new thing that the board does, and this court is well familiar with how the board issues its decisions. If it doesn't have anything different than it's going to do from what the administrative law judge did, it issues a decision like this. I mean, here they disavow. But on top of that, then, there's the incorporation of the administrative law judge decision. So the cases that are cited in there are necessarily incorporated into the decision of the board. And in there, for instance, I mean, Your Honors can go through that just as easily. If, for instance, United Postal Service is cited in there, that's a mixed-use case. In addition to that, the very cases cited by the board itself in footnote one, Superior Emerald Park Landfill is a mixed-use case. Transcon, I understand the board in that case said at best the area was mixed-use. So I guess arguably the board didn't decisively say it's mixed-use, but they certainly entered into that analysis. And then also Santa Fe Hotel and Casino was the same analysis that the board does, but they did it under the, they used the incidental use. But still, it's an examination of how much work is being performed in the area. So I think it's disingenuous to say the board didn't cite any cases that were applicable to the rule that they held here. And I'd also note, I should have probably noted this first, that it's the board's position that this very argument that the board doesn't have a standard and the board doesn't have a rationale and the board didn't justify its position here, it's our position, we put it in the brief, that this is an argument that wasn't appropriately presented before the board. And I think that's why you see a very, so we made the TANI argument, you see a very different brief coming from the petitioner, or coming from DHL, as opposed to what was presented to the board. And then you see a very different answering brief from the board than you see in a decision from the board itself. So I think if the petitioner, if DHL had presented these very arguments and said, board, you don't have a standard, board, you've never articulated a rationale, rather than confine their attack at the administrative level, which was to the factual underpinnings of the case, not the legal principles themselves, you would have seen a very different, at least a very different brief submitted by DHL, probably a very different brief submitted by the general counsel, and in all likelihood a different type of decision presented by the board. So I think if you look at the filings in this case and the decision in order, you can see why the board is making the argument, TANI, that these very arguments that they're trying to put before this court are inappropriate. Moving then to the issue of the special circumstances. And I do think the board pointed out in its brief, too, that I think it is difficult for the employer to reconcile the statement of its witness who said that, hey, if they just entered into the same agreement of the Teamsters, everything would have been fine. As the ALJ noted, that really undercuts the argument that there were special circumstances justifying their ban here. And I would note, because I think it's been lost sort of in all this, it is a heavily factual case with lots of numbers, I would note that there was no disruption shown. And I know that the DHL is saying, well, do we have to actually wait until there's some disruption in the hallway? But I would note that they were there, there's unrebutted testimony, and find it a fact that the hand-billers were there for 20 minutes. So it's not that we only had 30 seconds, 45 seconds, five minutes of this hand-billing going on where they cut it off and said, we can't wait for something bad to happen. You had 20 minutes of hand-billing where there were no reports of any problems with ingress or egress. You had no issues where anybody reported, even managers, employees, coworkers, nobody who reported any issue with the production of work interference. Nothing like that. So I think that, again, we pointed out in the brief that the fact that the hand-billers were directly under six television screens, that there is naturally, there are people stopping for moments in the hallway. I don't think it's, I think it's a bit hyperbolic to say that you can't, because I think it's in their brief, that you can't even stop for a moment or you'll be trampled. If that were the case, you wouldn't be setting computers up in a hallway. You wouldn't be setting television screens up in a hallway. And you wouldn't, and then I think you, if that were really the case, you wouldn't have, there would have been a problem with these hand-billers who stood there for 20 minutes. Why didn't the board find specifically that the hallway is a mixed-use area and use that language? I mean, at the very least, the language they used creates a bit of a problem, saying this is not exclusively a work area. See, I think the way that I, so that's the administrative law judge, and you're right, the board adopts that. The way that I read what the administrative law judge has done in his analysis is that he takes each of the factors, because there were five or six arguments being made for why this is either non-work or why it's work or why it's not enough mixed-use or too much mixed-use, and he goes by those point by point. And he says, and I think it starts, I'm sorry, this is my own DNO, so it's not going to match what's in the record, but it tracks pretty closely in the decision. So he says, first, and he addresses the issue of the security at the checkpoint. And he says, I find, and he analyzes that, and he says, you know, I just don't think there are enough employees who are actually doing work here for me to say this is work. So the evidence is, and then he says, based on these circumstances, I find the hallway is not exclusively a work area. And then he goes on to factor number two, and he does the same sort of analysis. He looks at it, weighs it, and says, I don't think this establishes that it's exclusively a work area. So the way that I read the administrative law judge's decision, and I think it's a fair reading of it, is that he's just ticking off the factors. But that phrasing, has that ever been the standard that's used? Do you have to find something exclusively a work area or not? That's not the phrasing that's used. No, no, and I think you're right, and I don't think the board has ever itself. They've never said anything like that. So while also the administrative law judge, I think what he's doing is saying, so it's easy, right, to do the test of this is exclusively non-work or this is exclusively work. It's the stuff that's in the middle that's hard. So the way that I read his decision, I read it as he's saying, based on this factor, I'm still not convinced that you did the bright line, this is a work area. So it's not exclusively work, so we're still going to have to talk about what is this. And then he goes to the next factor, and he says, well, that doesn't establish either that it's exclusively a work area, not in the sense that you have to show. You can see why employers would be worried about any rule that's phrased in those terms, right? I can understand that, but I don't think that the board, the board itself. So while the administrative law judge went through his analysis like that, I think at the end of the day he concludes this is a mixed-use area. He doesn't conclude this is a mixed-use area because the employer could not show that it was exclusively used for work. So while his rationale uses terminology that could, sure, cause heartburn for people, I think that if you look at the board cases across the board on the mixed-use, and you look at what the board said itself, which is significant. I know they didn't say a lot in this footnote, but those cases they cite too, they don't say that it has to be exclusive. And I don't think that you would find the board ever saying that, or an employer having to hit that hurdle. I think instead what you're going to find is a synthesis of the cases where they do, the board does undertake an analysis, say, is there enough work going on in this area, such that it's going to tip the scales in favor of us saying this is a work area, and I'm sorry, employees and unions, there's not going to be any distribution allowed in this area. So I think it's a synthesis of the cases that is more important themselves, more important than the specific usage of the word exclusively, that I think can sort of be read in the context. And then just one last note, I understand the employer's position, that it would be a heck of a lot easier to say even where there is some work going on and the board finds it to be a mixed-use area, that they would prefer a test where the presumption is they don't have to submit special circumstances. Unfortunately, that's not the law, and it's up to the board itself to make that determination. The board itself has decided that is not the path it wants to go down. So the employer's position notwithstanding, that's not the law that the board applies, and they have to abide by what the board says. They can make their policy arguments to the board. The board is free to reconsider them. As it stands right now, the board has chosen not to, to go with the standard that they have. Okay, is there any other questions? We'd ask for full enforcement of the board's order. Thank you. Thank you. With respect to the argument that the company waived any argument that the board has not ever adopted a test, suffice it to say that we didn't foresee that the board would issue a ruling that said a work area has to be exclusively a work area for an employer to prohibit distribution of literature. Could you have moved for reconsideration? Pardon? Could you have moved for reconsideration? I think there's a means by which we could have ruled for reconsideration on that particular issue, but I don't think it was mandatory that we do that. Well, I mean, the problem is how do we know what the board's response would be when the issue was not presented to it? And it's the board's decision to make. I can't disagree with that. But with respect to that, minimizing the significance of saying this was not exclusively a work area, the second sentence in the footnote is significant because it says, and I don't want to mess up, although it's a simple sentence, it says, thus an employer's right to preclude distribution of literature in working areas does not extend to mixed-use areas. So that would suggest that a finding that in areas of mixed-use areas, game's over. Game's over. And we submit that that's not what the board's case is whole, but that's what this case can be cited for. I mean, I understand that point, but on the other hand, the position before the board was that the employer did not have to show special circumstances. That was an alternative position. Well, I know. Our fallback was, but if you do find this to be equivalent of a non-work area, then we did have special circumstances. Now, going back to the distinction I drew about the TransCon and Arkansas UPS and how those were column-contaminated or polluted areas because other distributions had been permitted, I think if you look more closely at some of the other cases that involve distribution in these types of areas, and that would include vapor, patio foods versus NLRB, Times Publishing versus NLRB, Tim Kim, Lytton Microwave, I mentioned URCO, I mean, you're finding that in those situations you've got employees in work areas. And I think one of the most interesting decisions is vapor, the LG decision there, and it's an interesting read because it was issued by the late Tom Ritchie, who wrote many entertaining board opinions. But he said this involved a case with employees who were excused from work at 355 and punched out at 4, and there were 100 of them lined up to punch out. And during that period of time, there were employees on work, and the punch-out area happened to be in a traffic lane where forklifts could come through. And the judge said basically what the general counsel was arguing for was a now-you-see-it, now-you-don't legal standard under which if there are no forklifts coming, go ahead and distribute. But once those forklifts come, you better get out of the way, and now you can't distribute. And effectively, that's what we're saying effectively happens here is how do we make that determination as an employer when we have employees who are working in this particular area. So with respect to the special circumstances argument, one last point, and this goes back to what the ALJ said because the board didn't address this issue, and that was that there was no evidence of any interference. And I would submit that that one-bite type of rule isn't the standard, that if you look at patio homes, the Court of Appeals in that particular case said proof of a reasonable expectation of interference is appropriate. In a similar situation, this court recently ruled in Southern New England Telephone v. NLRB that the same was the standard, that you don't have to prove actual interference with production or discipline, but if you've got a reasonable basis to believe it. And the last point I'd make with respect to that goes to those kiosks and monitors, and I would ask the Court to remember that those were all basically focused on business-related purposes. Sure, they could go to the kiosk and go on the Internet, but for the most part, employees were checking their benefits, checking their pay stubs, communicating with HR there occasionally over these particular issues. Monitors had information about the day's performance, the weather, and so on, which is very relevant to a business operating at an airport. So there is a distinction there between that type of viewing and what was going on when these employees were hand-billing. Thank you. Thank you. All right, we'll take the case under advisement.
judges: Rogers, Brown, Griffith